496 P.2d 619

Vicki Lynn HEARD, a single woman, et al., Appellants,

v.

FARMERS INSURANCE EXCHANGE COMPANY, Appellee.

No. 1 CA–CIV 1478.

Court of Appeals of Arizona, Division 1, Department B.

May 2, 1972.

**194**

Langerman, Begam & Lewis, P. A., by Robert G. Begam and Stanley J. Marks, Phoenix, for appellants.

Johnson, Tucker & Jessen, P. A., by Kenneth L. Tucker, Phoenix, for appellee.

HAIRE, Chief Judge.

On this appeal we are called upon to decide whether the phrase "any resident of the same household" used in an insurance policy is ambiguous as applied to the facts presented to the trial court, and whether there was evidence to support the trial court's finding that the negligent driver and his stepfather were residents of the same household.

The undisputed facts show that appellant Vicki Heard sustained serious injury while riding as a passenger in a Cadillac being driven by Slavcho Ivanoff. The Cadillac was owned by Boris Dinkovski, Ivanoff's stepfather, and was being driven with his permission. It is admitted that Ivanoff was negligent and that Vicki Heard sustained total damages in the amount of $282,000, of which $7,000 constituted medical expenses reasonably and necessarily incurred as a result of her injuries and within one year from the date of the accident. The Cadillac was covered by an automobile insurance policy issued by Farmers Insurance Exchange Company. The policy provided for liability coverage in the amount of $250,000, and medical payment coverage in the amount of $5,000. This coverage, totaling $255,000, has been paid to Vicki Heard, and no question is raised on this appeal concerning the Cadillac policy and its applicability to cover the permissive driver's liability for the results of his negligence.[1]

The questions raised on appeal concern the possibility of coverage under an entirely separate automobile policy, also issued by Farmers, and covering a Mustang automobile owned by the stepson. This separate policy provided liability and medical payment coverage for the stepson as named insured and as owner of the Mustang *and also provided such coverage for him arising out of the use by him of a "non-owned" automobile.* It is the appellants' contention that Dinkovski's Cadillac, which was being driven by the stepson at the time of the accident, was such a "non-owned" automobile, and that therefore coverage limits under the Mustang policy are available in addition to the coverage under the Cadillac policy.

Procedurally the question of coverage under the Mustang policy was presented to the trial court by way of a declaratory

---

1. An issue concerning the applicability of the $5,000 medical payments coverage was raised by the insurer in the trial court, but by reason of procedural defects the insurer has lost the right to raise on appeal the correctness of the trial court's determination that the medical payment coverage was applicable over and above the liability coverage limits.

judgment action filed by Farmers pursuant to a settlement agreement between the parties. The evidence presented in the trial court related to factual issues as to whether Farmers was "estopped" to urge exclusion of coverage under the "non-owned" clause, and whether Dinkovski and Ivanoff were "residents of the same household" so as to exclude coverage under the Mustang policy. The trial court decided both of these issues in favor of Farmers, and this appeal then followed.

As to the "estoppel" issue, it was the appellants' contention that during settlement negotiations counsel for Farmers had agreed that he would raise only two defenses in the declaratory judgment action, and that the defense concerning the "non-owned" vehicle clause was not one of these defenses. On this issue the trial court entered an express finding as follows:

> "The Court finds against the defendants on their contention that there was an implied or express contract or agreement, limiting the provisions or clauses of the insurance contract upon which the plaintiff intended to rely."

 There is adequate evidence to support this finding by the trial court, and we will not re-try this issue on appeal.

Turning now to the question of coverage under the "non-owned" vehicle clause, the Mustang policy provided coverage not only for liability arising out of the Mustang's ownership, maintenance or use by the insured, but also for any liability which the insured might incur "arising out of the . . . maintenance or use of . . . a non-owned vehicle". "Non-owned vehicle" is defined in the policy as follows:

> "(8) Non-Owned Automobile means an automobile not owned by . . . the named insured or any resident of the same household . . . . "

Certainly in common parlance when Ivanoff was driving his stepfather's Cadillac at the time of the accident, he was driving a "non-owned" vehicle in the sense that he did not have title to it. However, the contract between the insurer and the insured, Ivanoff, modifies the common parlance meaning of "non-owned" as used in the policy—in clear and unmistakable terms no coverage is extended to the Cadillac as a "non-owned" vehicle if it is owned by "any resident of the same household". Thus the ultimate question for determination is essentially a factual determination as to whether Dinkovski and Ivanoff were residents of the same household at the time of the accident.

Preliminarily, we note that on its face we find no ambiguity in the language "residents of the same household". The principles governing the interpretation of insurance policies are fully set forth by the Arizona Supreme Court in D.M.A.F.B. Federal Credit Union v. Employers Mutual Liability Insurance Co. of Wisconsin, 96 Ariz. 399, 396 P.2d 20 (1964), as follows:

> "In the absence of a statutory provision which will be read into each policy issued thereunder and cannot be contracted away by either party, United States Fidelity and Guaranty Company v. Hirsch, 94 Ariz. 331, 385 P.2d 211 (1963), the principles to be applied in construing an insurance policy have been stated by this Court in a series of decisions and may be summarized as follows: The cardinal principle pertaining to the construction and interpretation of insurance contracts is that the intention of the parties should control. An insurance policy is a contract, and in an action based thereon the terms of the policy must govern. In construing an insurance contract, where there is any ambiguity, or more than one possible construction of the provisions thereof, it is to be construed most strongly against the insurer and in favor of the insured. *But, where the provisions of the contract are plain and unambiguous upon their face, they must be applied as written,* and the court will not pervert or do violence to the language used, or expand it beyond its plain and ordinary meaning or add something to the contract which the par-

ties have not put there. A. J. Bayless Markets v. Ohio Casualty Ins. Co., 55 Ariz. 530, 104 P.2d 145 (1940); Berry v. Acacia Mut. Life Ass'n, 49 Ariz. 413, 67 P.2d 478 (1937); Peterson v. Hudson Ins. Co., 41 Ariz. 31, 15 P.2d 249 (1932); Equitable Life Assur. Soc. of United States v. Pettid, 40 Ariz. 239, 11 P.2d 833 (1932); Queen Ins. Co. v. Watson, 31 Ariz. 340, 253 P. 440 (1927)." 96 Ariz. at 402–403, 396 P.2d at 22–23 (Emphasis added).

█ While there might be factual situations which would make difficult the determination of whether two different "households" were under one roof, such is not the case here. Applying the language of the contract to the facts of this case, the trial court expressly found that Ivanoff was a member of the Dinkovski household at the time of the collision. In our opinion the evidence fully justifies that finding.

The evidence disclosed that Ivanoff lived in Bulgaria until he was 22 years of age; that Dinkovski married Ivanoff's mother and they made arrangements to bring Ivanoff to America, paying $5,000 to the government of Bulgaria for that purpose. That prior to the accident Ivanoff's only home in America had been with his mother and his stepfather, Dinkovski. Evidence which strongly supports the trial court's finding is found in the uncontroverted testimony of Dinkovski. He testified that Ivanoff was his stepson, that he lived in his house free of charge, that he was provided with a weekly allowance of $75 to $100, whether he worked or not, and that Mr. Dinkovski himself paid all the household bills. Further, Mr. Dinkovski specifically testified as follows:

"Q. Now, did you treat him like a son?

"A. Exactly.

"Q. You cared for him, you sent him to school, gave him a job?

"A. Of course.

"Q. And while he lived in your household was he a member of your family?

"A. Yes, he is.

"Q. And was he subject not only to your advice and consultation but to your orders while he was in your household?

"A. Yes.

"Q. Was this an understanding which you had as head of the household for anyone who was a part of the family living under your roof?

"A. Yes, I do."

In short, Ivanoff slept under Dinkovski's roof and ate Dinkovski's food at Dinkovski's table, as a family member and subject to Dinkovski's direction, at least insofar as his activities within the household were concerned. As mentioned above, Dinkovski's testimony was uncontroverted.

Webster's Third New International Dictionary defines "household" as:

"[T]hose who dwell under the same roof, and compose a family".

The word "family" is derived from the Latin "familia", meaning the household, including not only the servants but also the head of the household and all persons in it related to him by blood or marriage. The usual connotation is to a group of individuals living under one roof and usually under one head. Here, the trial court correctly found that Ivanoff and Dinkovski were residents of the same household. The evidence would not have supported a finding that two separate households were involved.

Appellants place strong reliance upon Juzefski v. Western Casualty Surety Co., 173 Cal.App.2d 118, 342 P.2d 928 (1959), in contending that the phrase "any resident of the same household" is ambiguous. Such reliance is misplaced. The phrase actually construed in that case was "or a member of *his* household". (Emphasis added). The California court, in some rather strained reasoning, seized upon the use of the word "his" and found an ambiguity stating:

"Does 'his household' mean a household of which he is a part, or does it refer to a household of which he is the head?" 173 Cal.App.2d at 123, 342 P.2d at 932.

The court then found that it only included a household of which the son was the head. Because of the difference in language used, the reasoning of Juzefski has no applicability to the policy language and fact situation here presented. Here the use of the term "the *same* household" clearly contemplates a household of which Ivanoff is a part. Napier v. Banks, 19 Ohio App.2d 152, 250 N.E.2d 417 (1969) is distinguishable on its facts.

Appellants cite several decisions as authority for the proposition that courts should construe insurance policy provisions broadly in favor of expanded coverage. While the legal principle stated might be valid in the abstract, it has no application to the policy language and facts of this case. Further, it is our opinion that courts should exercise extreme care to make certain that the stated principle is applied only when there is in truth and in fact an actual ambiguity in the language of the policy as applied to the facts before the court. Judicial restraint should always be the keynote. The language used by Justice Struckmeyer in Kilpatrick v. Superior Court, 105 Ariz. 413, 466 P.2d 18 (1970), used in reference to statutory construction, is equally applicable to the construction of contracts, including insurance policies, as follows:

> "There is no magic in [contract] construction and no legal legerdemain should be used to change the meaning of simple English words so that the resulting interpretation conforms the [agreement] to the sociological and economic views of judges or lawyers. Words are to be given their usual and commonly understood meaning unless it is plain or clear that a different meaning was intended. (Citations omitted).

> \* \* \* \* \* \*

> "Courts are not at liberty to impose their views of the way things ought to be simply because that's what must have been intended, otherwise no statute, contract or recorded word, no matter how explicit, could be saved from judicial tinkering. Moreover, if the sense of a word

is not to be taken in its usual and commonly understood meaning except under circumstances where a different meaning is clearly intended, it becomes impossible for men to mean what is said or say what they mean and purposeful communication is unattainable." 105 Ariz. at 421–422, 466 P.2d at 26–27.

We hold that the policy language was not ambiguous and that the trial court correctly determined that there was no coverage provided by the language of the Mustang policy.

Appellants advance the further contention that notwithstanding the absence of contractual coverage under the language of the policy, the Arizona Safety Responsibility Act (often referred to as the Financial Responsibility Act) requires that the Mustang policy be applicable and provide coverage in the minimum amount of $10,000. This contention is based upon the provisions of A.R.S. § 28–1170, subsec. C, which reads as follows:

> "C. The *operator's* policy of liability insurance shall insure the person named as insured therein against loss from the liability imposed upon him by law for damages arising out of the use by him of any motor vehicle not owned by him, within the same territorial limits and subject to the same limits of liability as set forth in subsection B of this section with respect to an owner's policy of liability insurance." (Emphasis added.)

Appellants have failed to recognize that the provisions of the Safety Responsibility Act deal with two distinct types of policies: *Owner's* policies and *Operator's* policies. *See* Reserve Insurance Co. v. Staats, 9 Ariz.App. 410, 453 P.2d 239 (1969); Connolly v. Great Basin Insurance Co., 6 Ariz.App. 280, 431 P.2d 921 (1967). Here Ivanoff's policy was clearly an owner's policy falling under the provisions of A.R.S. § 28–1170 subsec. B. The requirements of § 28–1170, subsec. C refer only to an operator's policy. Furthermore, it is clear from the express provisions of A.R.S. § 28–1142, subsec. B that the sanctions and

requirements of the Safety Responsibility Act were not intended to be applicable to the *operator* of a motor vehicle if the *owner's* policy provided the minimum coverage required and was in effect at the time of the accident.[2] The owner Dinkovski's policy was in effect, covered Ivanoff as a permissive user, and provided $255,000 in coverage. Under the circumstances of this case, the provisions of the Safety Responsibility Act did not require an extension of coverage over and beyond that provided by the language of the policy.

 The final contention urged by appellants is that the trial court erred in refusing to award additional interest. At the conclusion of the declaratory judgment action, the trial court found that the appellants were entitled to recover the $5,000 medical payments coverage under the Cadillac policy, and awarded interest to appellants on that amount from the date of the judgment. Appellants contend that they were entitled to interest from the date of the settlement agreement, May 20, 1968. We agree. By the settlement agreement the exact amounts of all possible liabilities of Farmers became definitely established, the only question left being the question of coverage. In Arizona Title Insurance & Trust Co. v. O'Malley Lumber Co., 14 Ariz. App. 486, 484 P.2d 639 (1971), we held that interest was recoverable as a matter of right in a liquidated tort claim, and that a good faith dispute over liability did not defeat recovery of prejudgment interest on such a liquidated claim. Here, the claims became liquidated upon the making of the settlement agreement.

The judgment of the trial court is hereby modified so as to provide for interest on the sum of $5,000 from May 20, 1968 until the time said $5,000 was paid. As so modified, the trial court's judgment is affirmed.

EUBANK and JACOBSON, JJ., concur.

---

2. A.R.S. § 28–1142, subsec. B reads as follows:

"B. This section shall not apply under the conditions stated in § 28–1143 or to any of the following:

"1. To the operator or owner if the owner had in effect at the time of the accident an automobile liability policy with respect to the motor vehicle involved in the accident.

"2. To the operator, if not the owner of the motor vehicle, if there was in effect at the time of the accident an automobile liability policy or bond with respect to his operation of motor vehicles not owned by him.

"3. To the operator or owner if the liability of the operator or owner for damages resulting from the accident is, in the judgment of the superintendent, covered by any other form of liability insurance policy or bond.

"4. To any persons qualifying as a self-insurer under § 28–1222.